UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JANE M. SAUNDERS,

               Plaintiff,

v.                                          Case No.  5:06-cv-452-Oc-10GRJ

MICHAEL J. ASTRUE, Commissioner of
Social Security,

               Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Social Security disability insurance benefits("SSDI") and Supplemental Security Income ("SSI"). (Doc. 1.) The Commissioner has answered (Doc. 10), and both parties have filed briefs outlining their respective positions. (Docs. 21 and 22). For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. §405(g).

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for SSDI and SSI benefits on October 1, 2002 with a protective filing date of September 20, 2002 for her SSDI and a protective filing date of August 22, 2003 for her SSI, alleging disability commencing on May 3, 2001. (R. 52-55, 307-09.) Plaintiff's application was denied initially (R. 35-38) and upon reconsideration. (R. 41-43.) Plaintiff requested a hearing before an Administrative Law Judge, which was held on November 16, 2005. (R. 44, 320-60.) On February 22, 2006, following the

hearing, Administrative Law Judge Nino Sferrella (the "ALJ") issued a decision unfavorable to Plaintiff. (R. 9-20.) Plaintiff's request for review of that decision was denied by the Appeals Council on October 17, 2006 (R. 4-8), rendering the ALJ's decision the final decision of the Commissioner. On December 21, 2006, Plaintiff filed the instant appeal to this Court of the Commissioner's final decision. (Doc. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[1] See 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11]  Fourth, if a claimant's impairments do not prevent her from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
    In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born on September 18, 1944 and was sixty-one years old on the date of the ALJ's decision. Plaintiff has a high school education. (R. 53 and 70.) Plaintiff's past relevant work experience includes working as an insurance claims representative, office clerk and assembler. (R. 65.) Plaintiff alleges that she is unable to work due to arthritis, fibromyalgia/polymyalgia, back pain and depression. (Doc. 64.)

J. Jay Guth, M.D. treated Plaintiff for chronic back pain and left leg pain from May 2, 1997 through September 12, 2001. (R. 127-35, 184-92.) Dr. Guth reviewed Plaintiff's x-rays on June 4, 1997, which revealed Grande I-II spondylolisthesis with spondylosis[21]

---

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] Id.

[21] Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. Lippincott, Williams & Wilkins, Stedman's Medical Dictionary (27th ed. 2000).

at L5. (R. 191.) Dr. Guth treated Plaintiff's back pain with epidural injections, which seemed to provide moderate relief. (R. 190-91.)

Plaintiff returned to Dr. Guth for left knee pain on July 16, 2001. (R. 188.) An examination revealed crepitation[22] in both knees, medial joint space narrowing in both knees and a torn medial meniscus in her left knee. (R. 161, 189, 241-42.) Dr. Guth injected Plaintiff's left knee with cortisone to relieve the pain. (R. 188.) On September 12, 2001, Dr. Guth performed left knee surgery. Id. Two months following the surgery, Plaintiff continued to complain about increased pain in her left knee. (R. 187.) On January 28, 2002, Dr. Guth stated that Plaintiff's left knee was not better and had some intermittent swelling. Id.

John K. Hughes, M.D. treated Plaintiff for complaints about pain in the knees, back pain, fibromyalgia[23] and hypertension. (R. 193-244.) From February 18, 2002 through May 22, 2002 Dr. Hughes treated Plaintiff regarding complaints of neck pain, sweating at night and depression. (R. 220-22.) Dr. Hughes noted that Plaintiff had positive fibromyalgia trigger points, fibromyalgia, polymyalgia, and rheumatica.[24] Id.

At the request of the Bureau of Disability Determinations, Kirpal S. Sidhu, M.C. performed a consultative examination on Plaintiff in January of 2003. (R. 149-55.)

---

[22] Noise of vibration produced by rubbing bone or irregular degenerated cartilage surgaces together as in arthritis and other conditions. Id.

[23] A syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites .Id.

[24] A syndrome within the group of collagen diseases different from spondylarthritis or from humeral scapular periarthritis by the presence of an elevated sedimentation rate; much commoner in women than in men. Id.

Plaintiff reported pain in her knees, crunching in her neck and pain in her lower back down to her left lower extremity, fibromyalgia and depression. (R. 149.)

Dr. Sidhu stated that she had a reduced range of motion in the spine and knees. (R. 150, 153-54.) He also noted that x-rays of her lumbar spin revealed grade I spondylolisthesis with joint arthropathy in the lower lumbar spine, moderately severe degenerative disc changes and the moderate narrowing of the L4-5 disc. (R. 150, 155, 157.) Dr. Sidhu's impression included osteoarthritis of the left knee, lumbar spondylolisthesis with facet arthropathy. (R. 150.) Dr. Sidhu noted that "a sedentary sitting type work is possible" for Plaintiff to perform. Id.

On her follow-up examinations through March 18, 2003 with Dr. Hughes, Plaintiff reported improvement with her muscle aches with the medication Prednisone but continued to experience pain in her knees, as well as depression despite an increased dosage of Effexor. Dr. Hughes noted crepitus in the knees, pain in the right medial joint and left lateral joint. (R. 213-19.)  Dr. Hughes cleared Plaintiff for knee replacement surgery to be performed by Dr. Guth. (R. 201-202, 211.) Dr. Hughes also noted that Plaintiff experienced continual pain from fibromyalgia and chest pain. (R.207 -209.)

On May 20, 2004, Plaintiff was treated by Dr. Guth for knee pain. (Doc. 186.) X - rays revealed advanced arthritis bilateral. Id. Plaintiff underwent bilateral total knee arthroplasty (surgery) on June 16, 2004. (R. 130-31, 185.) Dr. Guth examined Plaintiff six months following the surgery and found no swelling or instability, and stated that Plaintiff had "done well." (R. 185.)

Plaintiff's records from MedCentral Health Systems for her surgery, note inpatient therapy and deep venous thrombosis prophylaxis. (R. 266-77.) The discharge

diagnoses revealed that Plaintiff was given medication for her pain and Effexor for her depression. (R. 268 and 270.) Dr. Hughes also examined Plaintiff after the surgery and did not find any effusion or other problems with Plaintiff's knees or her ability to walk, sit, stand and lift. (R. 196-97.)

State agency physician, Teresita C. Cruz, M.D. found that Plaintiff is limited to lifting 20 pounds occasionally and ten pounds frequently and walking no more than two to four hours. (R. 171.) Dr. Cruz noted that Plaintiff is limited to pushing/pulling with lower extremities, occasionally limited to climbing stairs, ramps, and occasionally limited to stooping, kneeling, crouching and crawling. (R. 170-75.)

During the hearing, Dr. Garling, a Medical Expert (the "ME") listened to Plaintiff's testimony and stated that he reviewed the medical records. (R. 343-355.) Dr. Garling testified that Plaintiff could at least perform "sit down work"/sedentary for the two years preceding her knee replacement surgery. (R. 347-48, 354.) Dr. Garling opined that following Plaintiff's successful knee replacement surgery in June of 2004, Plaintiff could stand for a third of an 8-hour workday, walk for a third of an 8-hour workday, lift 15-20 pounds occasionally, and sit without any limitations as long as she could occasionally get up to stretch. (R. 348-49.)

As for Plaintiff's depression, Dr. Hughes initially treated Plaintiff for depression beginning in May of 2001. (R. 118-126.) Dr. Hughes opined that Plaintiff was disabled and unable to return to work due to her depression through July 2, 2001. (R.123.) Plaintiff was prescribed Zoloft and Welbutron. (R. 124.) Plaintiff continued to suffer from depression through 2004. (R. 193-218.) Plaintiff reported daily crying spells. (R. 210.)

Dr. Hughes referred Plaintiff to Yogesh K. Desai, M.D. for a psychiatric evaluation on June 5, 2001. (R 113-117.) Plaintiff reported problems with co-workers and difficulty handling and dealing with people over the past year. (R. 113.) She felt increasingly isolated and withdrawn and was crying and sleeping more than normal. Id. Plaintiff also reported significant weight gain and inactivity. Id. Plaintiff articulated thoughts of suicide but "repeatedly stated that she had no plan or intent of killing herself." Id.

Dr. Desai opined that Plaintiff was "ambulatory, alert, oriented to time, place and person." He also noted that her attention and concentration span is fair, her memory of recent and remote events is intact and her intelligence is average. (R. 115.) Dr. Desai recommended outpatient therapy to learn coping skills. Dr. Desai also stated that Plaintiff could return to work within the next two weeks. Id.

Jay D. Haar, M.D. treated Plaintiff for depression from June 20, 2001 through January 25, 2005. (R. 136-38, 278-79, 300-305.) Dr. Haar reported to the Bureau of Disability Determination on October 22, 2002 that Plaintiff was depressed, had difficulty working, procrastinated, had difficulty with her memory and did not respond well to treatment. (R. 137-38.) Dr. Haar diagnosed Plaintiff with recurrent major depression. (R. 138.)

At the request of the Bureau of Disability Determinations, J. Joseph Konieczny, Ph.D. performed a consultative examination on Plaintiff on December 12, 2002. (R. 139-42.) Dr. Konieczny reported that Plaintiff appeared in great distress but was very cooperative. (R. 140.) Plaintiff told Dr. Konieczny that she was in pain and experienced mood swings, difficulty sleeping and daily episodes of crying. (R. 140-41.)

9

Dr. Konieczy found that she "showed adequate capability in her ability to perform logical abstract reasoning." (R. 141.) He noted that Plaintiff appeared to require assistance in those daily activities which are physically strenuous. Id. Dr. Konieczy further stated that Plaintiff "otherwise seem capable of managing her other daily activities and of her financial affairs without assistance." Id.

Dr. Konieczy concluded that Plaintiff's ability to understand and follow directions and to relate to others appeared to be adequate, but her ability to withstand stress and pressure was moderately impaired. (R. 142.) Dr. Konieczy's diagnostic impression of Plaintiff was depressive disorder with psycho-social stressors including medical conditions, physical limitations and the recent death of her mother. Id. Dr. Konieczy assigned Plaintiff a GAF score of 62 for symptom severity and a GAF score of 66 for function severity. Id.

William B. Schonberg, Ph.D. examined Plaintiff at the request of Richland County Jobs and Family Services in October of 2003. (R. 176-183.) Plaintiff reported taking Effexor for depression and fibromyalgia. (R. 180.) Plaintiff also reported problems with sleeping due to pain, low energy, constant pain with trouble standing, sitting, walking, bending and lifting, and crying spells and overeating. (R. 180-81.) Plaintiff expressed feeling hopeless, helpless and worthless. (R. 181.) However, Plaintiff admitted that "she does not think that her depression would necessarily stop her from working." (R. 182.)

Dr. Schonberg noted that Plaintiff's expression was sad and that Plaintiff became tearful during parts of the interview. Id. He stated that her mood and affect seemed depressed. Id. Dr. Schonberg diagnosed Plaintiff with dysthymic disorder which moderately impairs her mental ability to relate to others. (R. 182.) He assigned her a

symptomatic GAF score of 60 and a functional GAF score of 65. Id. Her ability to withstand the stress and pressures associated with day to day work activity is moderately limited due to her depression. (R. 183.) However, Dr. Schonberg noted that Plaintiff is capable of comprehending and completing simple, routine tasks at home and in the community. Id.

Plaintiff did not seek treatment again from Dr. Haar until late 2004, when Plaintiff reported continued use of Effexor due to frequent crying spells, feelings of being overwhelmed, frustration and worry, and depression. (R. 300.) Dr. Haar diagnosed Plaintiff with recurrent major depression with a differential diagnosis of bipolar depression, and assigned Plaintiff a GAF score of 65. Id. Dr. Haar increased Plaintiff's dosage of Effxor. (R. 301.) During follow-up examinations, Plaintiff reported that she had been sleeping and eating well. (R. 303, 305.) Plaintiff's nursing assessment noted that Plaintiff was alert, oriented, friendly, relaxed, talkative, tearful and cooperative. (R. 303.)

Dr. Haar evaluated Plaintiff's mental limitations on February 3, 2005. He noted that Plaintiff is moderately limited in all areas of mental functioning. (R. 278.) Dr. Haar reported that Plaintiff's physical conditions, including fibromyalgia and knee problems, had impacted Plaintiff's mental health. (R. 279.)

State agency consultant Robert L. Gaffey, Ph.D. opined that Plaintiff's affective disorder is not severe. (R. 148.) Dr. Gaffey found that Plaintiff only has a mild restriction of activities of daily living, and mild difficulties maintaining social functioning and maintaining concentration, persistence or pace. (R. 143-48.)

# IV.  DISCUSSION

The Plaintiff raises two issues on appeal. First, Plaintiff argues that the ALJ erred in finding that the Plaintiff retained the residual functional capacity to perform her past relevant work as she performed it and as generally performed in the national economy. Second, the Plaintiff challenges the ALJ's credibility finding.

While the Court concludes that the ALJ's finding that Plaintiff could perform her past relevant work is flawed - and therefore must be reversed and remanded - the Court will, nonetheless, address Plaintiff's challenge to the ALJ's credibility finding in view of the fact that such a finding will be relevant at a new hearing.

## A.  Substantial Evidence Supports the ALJ's Credibility Finding

The law concerning the analysis of subjective complaints of pain is well settled. In evaluating disability, the ALJ must consider all of a claimant's impairments, including his subjective symptoms, such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[25] The Eleventh Circuit has set forth a three-part test for determining when a disability may be established based on subjective complaints of pain.[26]  The "pain standard" requires that the plaintiff first produce medical or other evidence of an underlying medical condition. Then the plaintiff must demonstrate either that objective medical evidence confirms the severity of the alleged pain arising from that condition or that the objectively determined medical condition is of such a severity that it can be

---

[25] 20 C.F.R. § 404.1528.

[26] Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986).

reasonably expected to give rise to the alleged pain.[27]  "Pain alone can be disabling, even when its existence is unsupported by objective evidence."[28] However, a claimant's subjective complaints of pain do not conclusively establish a disability unless accompanied by medical evidence.[29]

If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[30] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[31]

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold"[32] assessment to Plaintiff's subjective complaints by noting that Plaintiff presented objective medical evidence of right knee osteoarthritis, status post right knee arthroscopy, status post bilateral knee replacements, obesity, a history of fibromyalgia, hypertension, depressive disorder and arthritis in her hands. (R. 14.) Once Plaintiff met

---

[27] Id.

[28] Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[29] 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms *shall not alone be conclusive evidence of disability* as defined in this section; there *must* be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability") (emphasis added).

[30] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[31] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[32] Marbury, 957 F.2d at 839.

this initial burden, however, the ALJ found Plaintiff's complaints regarding her level of

pain and inability to work were not wholly credible. (R. 15 and 19.)

In making this finding, the ALJ conducted a thorough examination of Plaintiff's

medical history, including Plaintiff's complaints of pain. The ALJ noted and properly

recognized that Plaintiff complained that "she is unable to walk, stand kneel or crouch

foronly [sic] short period because of the impact on her knee pain," that Plaintiff had

stated that "sitting for long period caused [sic] her additional leg pain," and that "she has

pain in her back, arm feet and hands, due to either her knee, back, fibromyalgia, or

arthritis." (R. 14.) Furthermore, the ALJ recognized that Plaintiff alleged an inability to

work due to her depression.

In accordance with the pain standard, the ALJ in this case articulated his reasons

for discounting Plaintiff's complaints of pain and major depression. The ALJ noted that

Plaintiff maintains a "fairly active lifestyle, including shopping for groceries, cleaning,

cooking, doing some laundry, driving, keeping in contact with friends and attending Bible

study." (R. 15.) Although Plaintiff's activities of daily living are not conclusive evidence

that she was not disabled during the relevant period of time, these activities are

consistent with the ability to perform sedentary work.[33]

In addition, Plaintiff testified that she worked as an assembler in a factory for

three months after she alleged her disability began and that she only stopped working

because her employer no longer needed her services. (R. 330, 332.) In November of

2002, Plaintiff stated that although "everything takes longer because of pain in legs and

---

[33] Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997.)

back," the ALJ noted that she is able to straighten the house, prepare meals, study the bible, work on the computer, shower and takes care of two cats. (R. 86.) Prior to her knee replacement surgery, Plaintiff stated that she could walk 100 yards without taking a rest and continue walking after taking a 2-5 minute break. (R. 90.) In October or 2003, Plaintiff also told the consultative psychologist, Dr. Schonberg, that she does her own cleaning, cooking and laundry, as well as goes grocery shopping and attends church. (R. 182.)

In addition to this evidence supporting the ALJ''s credibility finding, the ALJ properly noted and discussed the medical evidence that supported his reasons for concluding that Plaintiff's level of complaints were not credible. The ALJ noted that in January of 2003, Dr. Sidhu reported that Plaintiff's use of her cane was not mandatory. (R. 17.) Dr. Sidhu found Plaintiff's spondylolisthesis to be stable, that she maintained a good range of motion in her left knee and that any residual pain in her knees was attributed to obesity. Id. Notably, Dr. Sidhu concluded in his report that Plaintiff could perform sedentary work, a finding that is consistent with the ALJ's RFC evaluation. (R. 150.)

Although the ALJ did not accord great weight to Dr. Guth's assessments - because Dr. Guth did not treat Plaintiff from October 2002 through May 2004 while Plaintiff was waiting to qualify for Medicaid - Dr. Guth's reports, nonetheless, disclosed significant improvements in Plaintiff's knees after the surgery. Dr. Guth noted that Plaintiff was doing well, and on July 19, 2004, Dr. Guth stated that Plaintiff had no limitations in her ability to sit or use her hands for repetitive movements. (R. 184-85.) On

August 2, 2004, Dr. Guth noted that Plaintiff had a significant range of motion in her knees. Id.

The ALJ did give great weight to the state agency's physical assessment on March 2004. (R. 17.) Specifically, the ALJ noted the lack of evidence by any other physician that Plaintiff would have more significant restrictions from the date of onset through September 2004. Id.

Furthermore, the ALJ found that Plaintiff's RFC was consistent with Dr. Garling's opinion regarding Plaintiff's physical limitations. (R. 17.) Dr. Garling opined that Plaintiff would have very few additional limitations following surgery, concluding that Plaintiff could stand or walk for a third of an 8-hour workday, could lift 15-20 pounds occasionally, and could sit without any limitations as long as she could occasionally get up to stretch. (R. 348-49.)

The ALJ also adequately discussed the evidence that did not support Plaintiff's subjective complaints about the severity of her depression. (R. 17.) While Plaintiff testified that she is unable to work because of depression and frequent crying, which worsened when she and a co-worker had a conflict at work, she also testified that the medication she takes helps her depression. Moreover, despite the fact that Plaintiff complained that she could not work because of the severity of her depression, she testified that she got along with everyone except for some younger co-workers at her previous job and that she participates in social events, including talking with family and friends, going to church, participating in bible study, playing cards and going for rides. (R. 86, 89.)

The medical evidence reviewed and discussed by the ALJ fully supports the ALJ's finding that Plaintiff's mental limitations are moderate and does not support Plaintiff's claim that her depression limits her ability to work. This conclusion by the ALJ is consistent with the opinions of Drs. Hughes and Konieczny.  Dr. Hughes found that Plaintiff could return to work after an episode of depression on July 2, 2001. (R. 123.) In December of 2002, Dr. Konieczny opined that Plaintiff's ability to concentrate, attend to tasks, understand and follow directions, relate to others, and deal with the general public was adequate. (R. 142.) He concluded that Plaintiff's ability to withstand stress and pressure was moderately impaired but that she was only mildly depressed. Id.

The ALJ ultimately adopted the opinions of Drs. Haar and Schonberg, who found that Plaintiff has only moderate limitations in her ability to maintain social functioning, and understand, remember and carry out simple instructions. Dr. Schonberg noted in his October 20, 2003 assessment that he did not think Plaintiff's depression would stop her from working. (R. 182.) Consistent with this view Dr. Schonberg assigned Plaintiff a GAF score of 65 from a functional standpoint.[34] By February of 2005, Dr. Haar noted that Plaintiff was only moderately limited in all areas of mental functioning. (R. 279.)

Accordingly, for these reasons, the Court concludes that the ALJ articulated specific reasons for rejecting Plaintiff's credibility, which reasons were based upon the substantial medical evidence and other evidence of record. Where, as here, an ALJ has made a clearly articulated credibility finding based upon substantial supporting evidence in the record, a reviewing court should not disturb the findings by the ALJ.

---

[34] A GAF score between 61 and 70 indicates only some mild symptoms but generally, the individual is functioning pretty well. Diagnostic and Statistical Manual of Mental Disorders, text Revision 2000 (DSM-IV-TR 2000).

**B.  The ALJ Erred in Finding that Plaintiff Could Perform Her Past Relevant Work**

Although the ALJ did not err with regard to the credibility finding, the ALJ's finding that Plaintiff could return to her past relevant work is flawed and requires that this case be reversed and remanded.

 Social Security Ruling 82-62 requires an ALJ to obtain sufficient evidence to make a determination as to whether a claimant has the RFC to perform the physical and mental demands of her past work. In finding that an individual has the capacity to perform a past job, the determination or decision must contain: (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job; and (3) a finding of fact that the individual's RFC would permit a return to her past work.[35]

A claimant can perform her past work if (1) she retains the RFC to perform the functional demands and job duties of a past job as "she actually performed it;" or (2) she retains the RFC to perform the functional demands and job duties of a past relevant job as "it is usually performed in the national economy" based on the DOT or other similar source.[36]

To the extent that the ALJ found that Plaintiff could perform her past relevant work as she actually performed it, the ALJ's decision is flawed for several reasons.

The ALJ's finding that Plaintiff could perform her past relevant work does not contain any analysis or discussion but only the ALJ's bare conclusion. The only discussion by the ALJ with regard to his finding at step four of the sequential analysis

---

[35] SSR 82-62.

[36] SSR 82-61.

18

that Plaintiff could return to her past relevant work was the statement in his decision that "[b]ased upon the claimant's present residual functional capacity, Dr. Osipow opined that the claimant could return to her past relevant work as an assembler and office clerk as she previously performed this work and as it is generally performed in the national economy...The undersigned accepts and agrees with Dr. Osipow's opinion and finds that the claimant's present residual functional capacity does not preclude her doing her past relevant work."

As a threshold matter this finding is flawed because the ALJ did not include any mention or discussion in his decision of the physical and mental demands of Plaintiff's past jobs as an assembler or as an office worker other than referring to the opinion of the VE. Because the ALJ concluded that Plaintiff could perform her past relevant work as she actually performed it the ALJ was required to discuss how the Plaintiff's RFC was consistent with the physical and mental demands of her past relevant work.

Alternatively, even assuming that it was proper for the ALJ not to include in his decision any discussion of the physical or mental demands of Plaintiff's past relevant work - and instead simply recite that he was relying upon the opinion of the VE - the decision is still due to be remanded because the Court is unable to make any meaningful review of the testimony offered by the VE due to the fact that much of it is noted in the transcript as "inaudible."[37]

Moreover, the portions of the testimony of the VE that are transcribed, and are not noted as "inaudible," do not evidence what the VE assumed were the physical and

---

[37] *See,* R. 356-58.

mental demands of Plaintiff's past relevant work because the ALJ did not pose hypothetical questions to the VE which included all of Plaintiff's RFC or elicit testimony from the VE that addressed the physical and mental demands of Plaintiff's past relevant work. The only hypothetical posed to the VE was to assume that the past jobs were sedentary - without any mention of the physical or mental requirements of those jobs. To be fair, while the transcript does contain testimony from the Plaintiff about what she did as an assembler and as an office worker (and presumably the VE heard this testimony) the Court is unable to discern what the ALJ or the VE concluded were the physical and mental demands necessary to perform Plaintiff's past relevant work as either an assembler or as an office clerk. This omission is important because it is assumed that the VE's opinion that the Plaintiff could perform the demands of her past relevant work is based upon a comparison of Plaintiff's RFC with the physical and mental demands of the jobs Plaintiff actually performed.

The ALJ's error in failing to evaluate the physical and demands of past relevant work is underscored by reference to Plaintiff's limitation on stooping. Plaintiff reported that stooping was a requirement of her work as an assembler and as an office clerk. (R. 79-80.) The ALJ, on the other hand, found that Plaintiff's RFC included the restriction that  Plaintiff could not "stoop." Despite the obvious conflict between the fact that Plaintiff said she was required to stoop in her past jobs and the ALJ's conclusion that she could not stoop, the VE opined that Plaintiff could perform her past relevant jobs as she actually performed them and the ALJ adopted this opinion wholesale without any discussion as to whether stooping was a requirement of Plaintiff's past relevant work or, if so, how Plaintiff could perform a job that required stooping if she was unable to do so.

Because the transcript of the testimony by the VE is silent, and there is no discussion by

the VE in his decision, as to whether the ALJ or the VE considered stooping as a

requirement of Plaintiff's jobs as an assembler or as an office worker the Court is unable

to make meaningful review of the ALJ's finding that Plaintiff could perform her past

relevant work as she actually performed it.

      This flaw in the ALJ's finding that Plaintiff can perform her past relevant work is

compounded by the fact that the ALJ incorrectly recited in his decision that the VE

opined that - in addition to finding Plaintiff could return to her past relevant work as an

assembler and office worker as she performed this work - Plaintiff could return to her

past work as it is generally performed in the national economy. The transcript of the

testimony by the VE does not reflect, however, that the VE opined Plaintiff could

perform the jobs of assembler or office clerk as generally performed in the national

economy. The only testimony in the transcript that could be construed as addressing the

issue of past relevant work as generally performed in the national economy was a

question by the ALJ regarding the job of administrative assistant in the insurance

industry.[38] The Court was unable to find any testimony by the VE in the transcript

concerning whether Plaintiff could perform the jobs of office clerk or assembler as

generally performed in the national economy. This is not surprising in view of the fact

that the jobs of assembler and office clerk are not listed as sedentary and unskilled in

---

[38]    Q:     As administrative aide in the insurance industry?
         A.:    Yes.
         Q:     So [inaudible] skills are transferable [inaudible]?
         A.     No.
         Q:     So as performed pretty consistent with the DOT?
         A:     Yes.
         (R. 356-57.)

the Dictionary of Occupational Titles (the DOT), but rather are both listed as light work.[39] The classification of these jobs in the DOT is completely at odds with the ALJ's further statement in his decision that "[T]he vocational expert further stated that his testimony was consistent with the information provided in the *Dictionary of Occupational Titles* and in the *Selected Characteristics of Occupations.*" (R. 18.)

There are two ways of looking at this error by the ALJ, neither of which supports the Commissioner's view that the ALJ's decision should be affirmed.  First, assume the ALJ's statement in his decision is wrong that the VE opined Plaintiff could perform her past relevant work as generally performed in the national economy. In that case the ALJ's entire analysis is called into question because Dr. Osipow's opinion is the sole evidence relied upon by the ALJ for his finding that Plaintiff could perform her past relevant work.

Secondly, assuming that Dr. Osipow's testimony was that Plaintiff could perform her past relevant work as assembler and office clerk as generally performed in the national economy, the ALJ's decision is still flawed because the ALJ failed to resolve the direct conflict between the VE's testimony, that the jobs were sedentary, with the DOT's classification of both of these positions as light work.[40] The ALJ failed to resolve this conflict as required, or for that matter even recognize that there was a direct conflict between the VE's conclusion that Plaintiff could return to past relevant work at a sedentary RFC and the DOT classification that the work was classified as light work.

---

[39] Dictionary of Occupational Titles, "Assembler, Small Products," 706.684-022; "Clerical and Kindred Occupations/Alternate Titles: Office Clerk, Routine," 209.562-010.

[40] SSR 00-4p; *Leonard v. Astrue*, 2007 WL 1114009 (M.D. Fla. March 30, 2007.)

The decision in this case highlights the problems that are created when an ALJ fails to articulate in simple, clear, plain English, his reasoning and instead merely states his conclusions and attempts to support them by incorrectly reciting the transcribed testimony, which testimony in turn makes very little sense because of the presence of inaudible portions that force the Court to speculate as to what might have been said in the missing testimony. While the Court recognizes that ALJ's typically prepare their decisions without the benefit of the actual transcript, a simple, concise explanation by the ALJ in his decision as to why the evidence establishes that Plaintiff could perform the physical and mental demands of her past relevant work may have obviated the need for a new hearing. Because the ALJ, however, did not take the time to do that in this case, the Court has no choice but to remand this case for further proceedings so that the ALJ can address the physical and mental demands of Plaintiff's past relevant work, as she actually performed those jobs, and whether given Plaintiff's sedentary RFC, Plaintiff can perform one or more of these past relevant jobs. The Court is unable to divine from the ALJ's decision or from the transcript in this case the basis and predicate for the ALJ's finding that Plaintiff is not disabled because she can return to her past relevant work as she actually performed those jobs.[41] Accordingly, the decision must be reversed and remanded.

---

[41] Plaintiff's argument that the Court should apply the Grids and direct that benefits be awarded to Plaintiff cannot be addressed by the Court because of the error at step four by the ALJ. In view of the fact that the ALJ is required to engage in a further evaluation of whether Plaintiff can perform her past relevant work, there is no need for the Court to engage in a speculative analysis at step five by applying the Grids. In the event the ALJ on remand concludes that Plaintiff cannot perform her past relevant work the ALJ will then be required to complete the sequential analysis at step five by relying upon the Grids or utilizing the testimony of a VE, if necessary, to determine whether there are a sufficient number of jobs available in the national economy at Plaintiff's RFC.

## V.  <u>CONCLUSION</u>

In view of the foregoing, the decision of the Commissioner is due to be

**REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g) to the

Commissioner, for an Administrative Law Judge: (1) to reevaluate at step four of the

sequential analysis whether Plaintiff can perform the physical and mental demands of

her past relevant work considering Plaintiff's RFC and to articulate the reasons for the

ALJ's conclusion; (2) if appropriate, consider at step five whether Plaintiff can perform

other work that exists in the national economy; and (3) conduct any additional

proceedings the Commissioner deems appropriate. The Clerk is directed to enter final

judgment in favor of the Plaintiff consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 26, 2008.

Copies to:
    All Counsel

GARY R. JONES
United States Magistrate Judge